IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| KYLE SPRINGER, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3:14-CV-300 |
| | § | |
| UNKNOWN REKOFF, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## RULING REGARDING EXHAUSTION OF ADMINISTRATIVE REMEDIES

The plaintiff, Kyle Springer (TDCJ #01955605), is an inmate in the custody of the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ"). He has filed this action under 42 U.S.C. § 1983, alleging that he was subjected to excessive force while held in the Galveston County Jail ("the Jail"). Springer alleges that two jail guards, Defendants Cory Rekoff and Dante Austin, threw him to the ground and repeatedly kicked and punched him after Springer had a minor verbal disagreement with Austin; Springer was shackled and handcuffed at the time (Dkt. 17 at pp. 3–4). Springer also argues that Defendant Galveston County ("the County") is liable because Rekoff and Austin were acting pursuant to an official policy or custom of the County (Dkt. 17 at pp. 6–7, 13; Dkt. 62 at pp. 16–17).

The defendants contend that Springer failed to exhaust all available administrative remedies because he "failed to appeal his grievance regarding the incident made the basis of this suit" (Dkt. 58 at p. 11). Springer argues that the administrative appellate remedy

1

was unavailable under governing Supreme Court and Fifth Circuit precedent, and therefore did not need to be exhausted, because "there is no coherent or consistent process involving meaningful review for handling complaints that involve serious misconduct by guards" at the Jail (Dkt. 62 at pp. 13–14; Dkt. 71 at p. 1). The Court denied the defendants' motion for summary judgment on their failure-to-exhaust defense and is now sitting as factfinder with regard to that defense (Dkt. 65). *See Dillon v. Rogers*, 596 F.3d 260, 272–73 (5th Cir. 2010). The parties, at the Court's request, have submitted additional briefing and evidence (Dkt. 68 and Dkt. 71).

As explained below, the Court concludes that the defendants have not met their burden to show that Springer "had a fair, reasonable opportunity to apprise himself of the procedures" for appealing denied civil rights grievances at the Jail. *Davis v. Hernandez*, 798 F.3d 290, 295 (5th Cir. 2015); *cf id.* (holding that an inmate had a fair, reasonable opportunity to apprise himself of procedures when "the jail's grievance procedures [were] published in an inmate handbook . . . and explained on jail television" and "[no] circumstances precluded [the inmate] from accessing either source"). Consequently, the Defendants have not met their burden to show that those appellate procedures were "available" for purposes of the Prison Litigation Reform Act ("PLRA"). Indeed, on this record, even the Court could not say exactly what those procedures are, and it has the benefit of hundreds of pages of summary judgment evidence and briefing. And, for some reason, the handbook provided to inmates at the Jail does not even mention an appeals process for civil rights grievances, even though it outlines the process for appealing two

other types of administrative rulings. A very recent and unanimous opinion by the Supreme Court instructs that, under such circumstances, an administrative remedy is unavailable. *Ross v. Blake*, 136 S.Ct. 1850, 1858–60 (2016). As the Seventh Circuit has aptly phrased it, "[p]risoners are required to exhaust grievance procedures they have been told about, but not procedures they have not been told about." *King v. McCarty*, 781 F.3d 889, 896 (7th Cir. 2015). This case will proceed.

## I.     **THE GOVERNING LAW**

The PLRA requires that an inmate exhaust all available administrative remedies before he may maintain a lawsuit in federal court. *See* 42 U.S.C. § 1997e(a). The exhaustion requirement applies to all inmate suits about prison life, including lawsuits alleging excessive force. *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "Exhaustion is defined by the prison's grievance procedures, and courts neither may add to nor subtract from them." *Cantwell v. Sterling*, 788 F.3d 507, 509 (5th Cir. 2015). Because exhaustion of remedies is an affirmative defense, it is the defendant's burden to establish that there were available procedures that the inmate did not exhaust, and what those procedures were. *Id.* Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact. *Dillon*, 596 F.3d at 266. "Similarly, while it is a question of law whether administrative remedies qualify as being 'available' under 42 U.S.C. § 1997e(a), availability may sometimes turn on questions of fact." *Id.*

The Supreme Court's recent *Ross* opinion sets out "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to

obtain relief" and hence unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates[;]" (2) when "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it" because "no ordinary prisoner can make sense of what it demands[;]" and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S.Ct. at 1858–60. If a remedy is unavailable, it need not be exhausted. *Id.*

## II. DISCUSSION OF THE EVIDENCE AND ARGUMENTS

The Jail's policy manual describes a two-step grievance process (Dkt. 58-5 at pp. 131–33). The first step is a review by a three-member Grievance Board of the grievance; the second is an "appeal to the Sheriff or his designee" in the event the grievance is unsuccessful (Dkt. 58-5 at pp. 131–33). No deadline is given in the policy manual for inmates to initiate either step, although the Jail's step one grievance forms instruct inmates to "[p]ut this completed form in an envelope addressed to the Grievance Board the same day or the next normal workday" (Dkt. 58-4 at p. 33).[1] There is no step two grievance form in the record, and it does not appear that such a form exists. Jail officials have 15 days to respond at both steps (Dkt. 58-4 at p. 33; Dkt. 58-5 at p. 133).

---

[1] Any deadline for step one grievances is moot at this point because Springer's step one grievance was not denied based on untimeliness (Dkt. 58-4 at pp. 32–33). *Gates v. Cook*, 376 F.3d 323, 331 n. 6 (5th Cir. 2004) ("As MDOC ignored this technical defect but instead addressed Russell's request at the administrative level and denied it for matters of substance, it cannot now claim that Russell failed to exhaust based on this technical defect."). The defendants do not argue that there is a deadline at either step.

4

In moving for summary judgment on their failure-to-exhaust defense, the defendants contended that the "clear" language of the policy manual establishing a right to appeal conclusively proved their defense (Dkt. 58 at p. 11). The policy manual's language does indeed provide a right to appeal, if one governed by rather vague procedural provisions; but the manual is provided to Jail employees, not inmates, and there is no evidence that Springer ever saw it. Moreover, Springer was, like all other Jail inmates, provided with an "Inmate Handbook" that says not one word about an appeals process for civil rights grievances:[2]

> INMATE GRIEVANCE PROCEDURE
>
> You are allowed to file a grievance at any time you are subjected to a prohibited act by a staff member, constitutional rights violation, criminal act or denied privileges (without just cause) specified in this handbook.
>
> To file a grievance, you must send a written statement directly to the grievance review board. The statement must contain the time, date, names of deputies and/or staff members involved and all pertinent details of the incident and names of any witnesses. All grievances will be investigated, appropriate corrective action taken, and a report issued to the inmate. Do not file a grievance on behalf of another inmate.
> Dkt. 58-4 at p. 53.

To further confuse the issue, the inmate handbook thoroughly outlines the steps by which inmates can appeal two *other* types of administrative rulings: (1) a finding by a disciplinary committee that the inmate is guilty of violating jail rules (Dkt. 58-4 at pp.

---

[2] Notably, the response denying Springer's step one grievance also said nothing about grievance appeals. Instead, it said that the matter was "considered closed" (Dkt. 58-4 at p. 32).

51–53);[3] and (2) the rejection of a grievance alleging discrimination in violation of the Americans with Disabilities Act ("ADA") (Dkt. 58-4 at p. 53).[4] The sections of the handbook that spell out how to appeal disciplinary proceedings and ADA grievances bookend the section discussing civil rights grievances, which does not so much as say the word "appeal." The language of the inmate handbook conveys the clear message that there is only one step involved in the civil rights grievance process: the filing of a grievance.

By way of comparison, the TDCJ Inmate Handbook, which the defendants themselves have submitted as evidence, not only alerts TDCJ inmates to the existence of an appeals process but thoroughly discusses the appropriate procedural steps:

> GRIEVANCE PROCEDURES FOR OFFENDERS
>
> A. Grievance forms are available from the law library, housing area, shift supervisors, or by contacting the unit grievance office. After completely filling out the form, place it in the grievance box yourself or give it to the grievance investigator on your unit.
>
> B. An attempt to informally resolve your problem must be made before filing a grievance. Informal resolution is defined as any attempt to solve

---

[3] "You have the right to appeal the decision of the disciplinary committee. . . . If the inmate does not agree with the decision of the disciplinary officer or board, he may appeal the decision to the sheriff or designee, whose decision is final" (Dkt. 58-4 at p. 51).

[4] "In the event that an inmate wishes to appeal the decision of the ADA coordinators [sic] response, the inmate shall request in writing a review of such decision by the director of corrections. All decisions of the director on appeal grievances are final. This appeal must be done within five (5) days of the grievance decision. If the ADA grievance is not resolved during the appeal process, the inmate has the right to file a complaint with:
U.S. DEPARTMENT OF JUSTICE
CIVIL RIGHTS DIVISION
DEPARTMENT OF JUSTICE
950 PENNSYLVANIA AVE, NW
WASHINGTON, DC 20530" (Dkt. 58-4 at p. 53) (paragraph break omitted).

> the issue at hand and must be noted on the Step 1 grievance form (I-127). You have 15 days from the date of the alleged incident or occurrence of the issue presented in which to complete the Step 1 grievance form and forward it to the Unit Grievance Investigator (UGI). The Step 1 process may take up to 40 days from the date the unit grievance office receives the Step 1 form. *If you are not satisfied with the Step 1 response, you may appeal the Step 1 decision by filing a Step 2 (I-128). You have 15 days from the date of the Warden's signature on the Step 1 form to submit the Step 2 to the grievance investigator on the unit. The Step 2 process may take up to 35 days to provide you a written response.*

Dkt. 68-3 at p. 62 (emphasis added).

The extensive information contained in the TDCJ inmate handbook makes it easy for inmates and officials—and courts—to determine when administrative remedies have been properly invoked and exhausted.

The defendants have conceded that the Jail's appeals process for civil rights grievances "is not explicitly described in the [inmate] handbook"—it would be more accurate to say that the handbook does not even mention the existence of any such process—but insist that there is in fact an "appeal procedure" that "is known to inmates in the jail and frequently used" (Dkt. 68 at p. 6). Paradoxically, the defendants also insist that, when Springer was in the Jail, Jail officials "liberally treated inmates' responses to denied grievances as appeals" (Dkt. 68 at p. 7). These muddled statements signify a serious problem—namely, the Jail apparently has no concrete appeal procedure for civil rights grievances. The defendants imply that the Jail employs a policy of "liberal treatment" that inures to the inmates' benefit and ensures that complaints about grievance proceedings are heard, but this case has shown that there are limits to the "liberal

7

treatment" afforded to inmates' complaints about denied grievances. And those limits, at least based on the evidence before the Court, are impossible to ascertain, which enables Jail officials to move the goalposts as they see fit when deciding what constitutes a sufficient attempt to comply with the "appeal procedure."

Springer's case provides a good example. The defendants have submitted an affidavit in which a guard testifies that inmates can and do appeal denials of civil rights grievances in various ways "per the guidelines in the Policy Manual" (Dkt. 58-7 at p. 1). But the policy manual (which Springer never saw anyway) contains no guidelines; it does not provide a single specific way to perfect an administrative appeal. The manual simply says:

> GRIEVANCE REVIEW (APPEAL)
>
> A. If the decision made by the Grievance Board is disputed by the inmate, he may appeal to the Sheriff or his designee.
>    1. Upon receipt of the appeal request, the Sheriff or his designee will review the findings and actions taken by the Grievance Board.
>    2. The Sheriff or his designee will notify the inmate(s) in writing of his decision as soon as possible, but not to exceed fifteen (15) days. (Excluding weekends and holidays).
>    3. The Sheriff's or his designee's decision will be final.
>
> B. Records will be maintained of all hearings, reviews, and action(s) taken. A copy of inmate notification letters will be placed in the Jail Administration files. No information will be released unless approved by the Sheriff or his designee.
> Dkt. 58-5 at p. 133.

Contrast that passage with its counterpart in the TDCJ handbook, which sets out a well-defined policy specifying what printed form an inmate must use to appeal the denial

8

of a grievance, where the inmate can find that form, to whom the inmate must submit that form, what the deadline is for submitting the form, and when the inmate can expect a response (Dkt. 68-3 at p. 62). The Jail does not provide much of this information in the handbook it gives to its own employees and does not provide *any* of it in the handbook it gives to the inmates. The guard's affidavit claims that Jail inmates know that they can appeal denied civil rights grievances by: (1) "submit[ting] a duplicate grievance[;]" (2) "indicat[ing] the desire for an appeal on the grievance response and submit[ting] the response form[;]" or (3) "fil[ing] a separate grievance, grieving the result of the initial grievance" (Dkt. 58-7 at p. 1). The Court has no idea whether this list is exhaustive (a policy of "liberal treatment" would indicate not); whether it is conveyed to Jail inmates by Jail officials (let alone how it is conveyed); or even where it came from. But Springer has offered uncontroverted testimony showing that he met with a lieutenant from internal affairs and "asked for a complaint packet" from that lieutenant (who said nothing about grievance appeals) after his grievance was denied (Dkt. 62-3 at p. 3). As a means of protesting the denial of a civil rights grievance—a grievance stemming from the actions of jailers, no less—complaining in person to a lieutenant in the Jail's internal affairs department is at least as intuitive as "submitting a duplicate grievance" or "grieving the result of a grievance." Yet, despite their "liberal treatment" policy, the Jail officials have, for reasons again unilluminated by the record, apparently drawn the line somewhere between the first avenue and the latter two.

The defendants do not explain how the Jail drew that line but argue that, regardless, Springer should have known where it was drawn, i.e. Springer should have known that there was a second step to the grievance process and what it was. They first support this argument with the contention that Springer "had inquiry notice" that he could appeal denied civil rights grievances but did not "ma[k]e any inquiry to any official person or resource regarding grievance procedures" (Dkt. 68 at p. 6). The Court rejects this contention. Springer did everything required by the clear language of the Jail's inmate handbook. If that handbook is not to be considered an "official resource," then the Jail should stop distributing it to inmates. The Jail should also, for example, stop telling its employees, by way of their policy manual, that during initial inmate classification "[t]he Classification Deputy shall answer, to the best of his ability, any questions which an inmate may pose relative to the rules and regulations set forth in the INMATE HANDBOOK" (Dkt. 58-4 at p. 113–14) (emphasis in original). In any event, the defendants' only support for their statement that Springer was on "inquiry notice" in the first place is, incredibly, the fact that Springer was once in TDCJ custody (Dkt. 68 at p. 6). Even if Springer knew about TDCJ's two-step grievance process, it is nonsense to suggest that Springer should have assumed that the Jail followed TDCJ's framework instead of the one described in its own inmate handbook. The defendants' contention is made all the more remarkable by the fact that the TDCJ inmate handbook prohibits redundant Step One grievances, while the defendants claim that redundant Step One grievances are how Jail inmates exhaust their administrative remedies. The TDCJ

handbook explicitly admonishes inmates, in bold letters, "not [to] repeatedly grieve the same issue" (Dkt. 68-3 at p. 62), while the defendants claim that Jail inmates exhaust their administrative remedies precisely *by* repeatedly grieving the same issue (Dkt. 58-7 at p. 1).

The defendants also contend that Springer's testimony about what another inmate told him regarding the grievance process is unreliable (Dkt. 68 at p. 4). Springer testified by affidavit that "[he] did not know of any grievance review process" until another inmate, Robert Calderon, told him that "the next thing to do after the grievance reply was to ask for a complaint packet from internal affairs" (Dkt. 62-3 at p. 3), which Springer did. The defendants do not have any evidence, from Calderon or anyone else, contradicting Springer's account; but they counter that "Calderon was unlikely to make th[e] mistake" of telling Springer to go to internal affairs because "Calderon knew and used the grievance appeal process in the Galveston County Jail" (Dkt. 68 at pp. 4–5). The defendants are asking the Court to speculate that Calderon in fact told Springer the "correct" grievance appeal procedures and that "Springer simply failed to do as he was told in his haste to file this lawsuit" (Dkt. 68 at pp. 4–6). The Court will not engage in that speculation. If nothing else, there does not appear to *be* a set of "correct" grievance appeal procedures at the Jail. At best, there is a loose collection of amorphous *ad hoc* policies that are not memorialized anywhere (not even in the employees' handbook) and the origin of which is uncertain. Furthermore, there is no discernible motivation for Springer to tell that particular lie. "Haste to file this lawsuit," to the extent it would be

probative, would be better evidenced by Springer's failure to do anything after his grievance was denied. Instead, Springer put in a successful request for an in-person meeting with a lieutenant from internal affairs and requested complaint paperwork from that lieutenant, which undoubtedly took a great deal more time and effort than simply filling out a redundant grievance form would have. A lie justifying doing nothing would at least make sense; a lie justifying doing far more than the defendants say was required does not. The Court considers Springer's account credible.

In short, the Court will allow this case to go forward. The PLRA requires prisoners to exhaust administrative remedies because Congress wanted to "afford[] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter*, 534 U.S. at 525; *see also Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001) (describing TDCJ's grievance program as "a detailed, complex and carefully thought-out program to facilitate the filing of grievances and assure their prompt, dispassionate investigation"). The exhaustion requirement does not exist so that corrections officials can play three-card monte with administrative remedies to prevent inmates from petitioning the federal courts for relief. *See Ross*, 136 S.Ct. at 1858–60. The initiation of civil rights grievance appeals at the Jail, by all indications, is not governed by any set procedures, and the materials provided to inmates do not even mention that such appeals are possible; it is hard to see how this program secures prompt, meaningful review of grievance proceedings. What is especially mystifying, given the defendants' hard line on exhaustion, is that the Jail policy manual's scant procedural

provisions addressing grievance appeals run counter even to the goal of curbing lawsuits. For instance, the Jail's policy manual provides no deadline for inmates to appeal the denial of civil rights grievances, although it provides a 15-day deadline for Jail officials to resolve an appeal (Dkt. 58-5 at p. 133). Springer could submit a grievance appeal today (however that is done) and be in compliance with the administrative procedures as the Jail officials have written them. "The Sheriff or his designee" would then have to "notify [Springer] in writing of his decision as soon as possible, but not to exceed fifteen (15) days" (Dkt. 58-5 at p. 133). Even if the defendants succeeded in their push for a dismissal on failure-to-exhaust grounds, they would only get a dismissal without prejudice so that Springer could pursue the appellate remedy, and limitations would be tolled. *Wright*, 260 F.3d at 359; *see also Harris v. Hegmann*, 198 F.3d 153, 157–59 (5th Cir. 1999); *Abbott v. Babin*, 587 Fed. App'x 116, 119 (5th Cir. 2014). And even that disposition would be pointless because Springer's transfer to TDCJ custody rendered any remaining remedies unavailable anyway. *See Cowart v. Erwin*, 837 F.3d 444, 451–52 & n. 13 (5th Cir. 2016) (citing cases holding that a county jail's administrative remedies become unavailable after an inmate is transferred beyond the county jail's jurisdiction); *see also White v. Bukowski*, 800 F.3d 392, 396–97 (7th Cir. 2015) ("The jail's grievance procedure, as described in the inmate handbook, established no deadline for filing a grievance[.] Uninformed about any deadline for filing a grievance[,] the plaintiff cannot be faulted for not having filed a grievance before she was transferred from the jail for good.").

Springer's motion for an extension of his time to submit evidence on the exhaustion issue (Dkt. 70) is **GRANTED**. The defendants have not carried their burden of proving that Springer failed to exhaust administrative remedies that were available to him. This case will proceed.

The Clerk shall provide a copy of this order to the parties.

SIGNED at Galveston, Texas on May 12, 2017.

George C. Hanks
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE